NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| DEREK VINCENT LOGAN, | |
|     Plaintiff, | Civil No. 14-04571 (RMB) |
|        v. | **OPINION** |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | |
|     Defendant. | |

**APPEARANCES:**

Agnes S. Wladyka, Esq.
1122 Route 22 West
Mountainside, New Jersey 07092
    Attorney for Plaintiff

Theresa Ann Casey,
Social Security Administration
Office of the General Counsel
300 Spring Garden St., 6th Floor
Philadelphia, Pennsylvania 19123
    Attorney for Defendant

**BUMB,** UNITED STATES DISTRICT JUDGE:

    Plaintiff Derek Vincent Logan (the "Plaintiff") seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3) of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  For the

1

reasons set forth below, the Court vacates the ALJ's decision and remands for further proceedings consistent with this Opinion.

I.    **BACKGROUND**

      A.    **Procedural Background**

      Plaintiff protectively filed applications for disability and SSI insurance benefits on February 1, 2011, alleging a disability onset date of March 31, 2009 (the "original alleged disability onset date"). (Administrative Record "R" at 185-93, 205-06.) Plaintiff later amended the onset date to December 1, 2011 (the "amended alleged disability onset date"). (R. at 212.) The Social Security Administration ("SSA") denied Plaintiff's applications on June 7, 2011. (R. at 101-04.) Plaintiff thereafter requested a hearing before an Administrative Law Judge ("ALJ") on July 11, 2011. (R. at 105.) Hearings were held before the Honorable Javier Arrastia on June 28, 2012, and December 12, 2012. (R. at 30-89.) Plaintiff testified at the hearing and was represented by counsel. (R. at 32, 73.)

      On January 18, 2013, the ALJ issued a decision denying Plaintiff's application, finding that Plaintiff has not been under a disability from the original alleged disability onset date, March 31, 2009, through the date of decision. (R. at 7-17.) Plaintiff timely appealed the ALJ's decision, (R. at 28,

2

267-70), which the Appeals Council denied on May 15, 2014.  (R. at 1-3.)  At that time, the ALJ's decision became the final decision of the Commissioner.

### B.   **Factual Background**

Plaintiff was 48 years old, which is defined as a "younger person" under the regulations, 20 C.F.R. § 404.1563, on the amended alleged disability onset date.  (R. at 185-86, 212.)  In Plaintiff's disability report submitted as part of his application for disability benefits, he states that he suffers from diabetes mellitus and substance abuse.  (See, e.g., R. at 251.)  He also alleges he suffers from neuropathy and has been diagnosed with major depressive disorder.  (R. at 12.)

In his Adult Function Report, completed on February 19, 2011, Plaintiff reported that he is able to bathe himself, attend church, take care of his son, shop for groceries, prepare meals, and perform other household duties, including laundry. (R. at 216, 220-23.)  Everyday Plaintiff gets his son ready for school, walks him to the bus, and then returns home to elevate his legs for a few hours.  He also cleans the house, prepares dinner, and helps his son with his homework.  (R. at 220.)  He reports that it takes him longer to do these things and that he has trouble paying attention for more than two hours at a time and finishing what he starts because of the pain and heaviness in his legs and feet.  (R. at 218, 222-23.)  For example, it

takes him approximately two hours to cook a complete meal with baked chicken, steamed vegetables, and brown rice, and 15-25 minutes to prepare sandwiches or frozen meals.  (Id.)  He also reports having trouble with his balance and with blurry vision. (R. at 216, 219.)  He can walk but needs to take a fifteen-minute break after walking one block because of the pain in his legs and feet.  (R. at 218.)  He also enjoys reading and watching television, but sometimes shortens the time he spends doing so due to blurry vision.  (R. at 216.)

Finally, Plaintiff reports having a history of smoking cigarettes, drinking alcohol and using crack cocaine.  (R. at 224.)  He was hospitalized for chest pain likely caused by his drug use in March 2012.  (R. at 428.)

### C.   **Medical Evidence**

 Plaintiff suffers from diabetes mellitus, neuropathy, depression NOS (not otherwise specified), and substance induced mood disorder.  (R. at 12.)  He was diagnosed with diabetes at some point between 2005 and 2007, (R. at 254, 275), and with neuropathy around June 2008.  (R. at 274.)  Plaintiff has sought treatment for these conditions over the years, but the medical records frequently indicate his non-compliance with his prescribed treatment regimen.  (R. at 274, 278, 286, 289, 309, 316.)

On April 7, 2011, prior to the amended alleged onset date, a state medical examiner, Dr. Yacov Kogan, conducted a physical examination of Plaintiff in connection with his disability claims for diabetes and substance abuse.  (R. at 321-23.)  At this time, Plaintiff reported chronic numbness of the bilateral hands and feet.  (R. at 321.)  Plaintiff also reported having a history of heavy alcohol use, with his last drink being six months prior, and of cocaine abuse, with his last drug use being 2 days prior.  (R. at 321.)  Dr. Kogan's findings included: normal pupillary reflexes and extraocular movements; normal motor strength (5/5); and normal to light touch and pinprick sensation in the upper and lower extremities.  (R. at 321-23.)  Dr. Kogan also noted that Plaintiff's fine finger movements were normal bilaterally.  (R. at 321.)

On May 24, 2011, the reviewing state agency physician, Dr. Angelina Jacobs, assessed Plaintiff's residual functional capacity ("RFC") in light of his diabetes mellitus with evidence of neuropathy.  (Id. at 97.)  Dr. Jacobs found inter alia that Plaintiff has postural limitations but no manipulative limitations.  (R. at 96.)  She also found that Plaintiff is able to lift or carry up to fifty pounds occasionally and twenty-five pounds frequently, push and pull without limitations, and stand, walk, and sit for a total of about six hours in an eight-hour workday.  (R. at 96.)  She further found that Plaintiff is able

to frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and that he is never able to climb ladders, ropes and scaffolds.  (R. at 96.)

In August 2011, Plaintiff began somewhat regular treatment with Dr. Garrick Baskerville.  (R. at 449.)  On August 26, 2011, Plaintiff visited Dr. Baskerville and informed him that he had obtained a lawyer to assist him with his disability application because of "numbness in his legs and in the left arm."  (R. at 449.)  Dr. Baskerville conducted a physical examination of Plaintiff and concluded he had poorly controlled diabetes and diabetic peripheral neuropathy.  (Id. at 450.)  Dr. Baskerville prescribed several medications.  Plaintiff followed-up with Dr. Baskerville regarding his diabetic medication on September 16, at which time he reported sugar levels between 110 and 240.  (Id. at 446.)  On October 7, 2011, Plaintiff met with Dr. Baskerville, complaining of depression, suicidal thoughts, and insomnia.  (Id. at 443.)  Dr. Baskerville made no specific findings as to Plaintiff's arms, but did note peripheral neuropathy as well as abnormalities and decreased sensation in Plaintiff's feet.  (Id. at 443-44.)  Plaintiff was prescribed neurontin to assist with neuropathic pain and was instructed to wear appropriate shoes.  (Id. at 444.)

Plaintiff returned to Dr. Baskerville on November 29, 2011, complaining of neuropathy in his feet and was referred to a

6

neurologist.  (Id. at 441.)  Plaintiff followed-up with Dr.
Baskerville on December 12, 2011, at which time he reported that
he was not taking his diabetes medication because he "ran out of
refills."  (Id. at 436.)  Plaintiff also complained of numbness
and tingling in his legs, causing Dr. Baskerville to order a
limited EMG study of Plaintiff's bilateral lower extremities.
(Id. at 436.)

On January 11, 2012, Plaintiff had electromyography
(EMG/NES) testing performed by Dr. Ramani Balu.  (R. at 338-40.)
At this time, Plaintiff reported bilateral burning pain,
numbness, and tingling in his lower legs, and burning pain and
numbness in his right arm.  (R. at 338.)  Dr. Balu's
neurological examination revealed normal bulk and tone, and
normal strength except for the intrinsic hand muscles (4/5) and
the toe flexors and extensors (4/5); no vibration sensation on
the toes; and decreased cold sensation, light touch and pinprick
sensation up to the knees.  (R. at 341.)  The nerve conduction
study showed low amplitude and evidence of motor conduction
slowing in both right ulnar and radial sensory and motor
studies.  (Id.)  Dr. Balu opined that Plaintiff has chronic
sensorimotor polyneuropathy, the likely cause of which is his
diabetes, as well as co-existing, superimposed right ulnar
neuropathy at the elbow and median neuropathy at the wrist.  (R.
at 338-40.)  Dr. Balu explained to Plaintiff that controlling

7

his blood glucose levels was important to controlling his neuropathy, and prescribed nortripyline and gabapentin for the neuropathic pain.  (Id. at 339.)

After the EMG, Plaintiff returned to Dr. Baskerville on January 11, 2012.  At that time, he complained of neuropathic pain in his legs but noted that he has been taking Neurontin regularly, which "helps a lot."  (Id. at 431.)  It was during this visit that Dr. Baskerville first noted that Plaintiff's recent EMG shows right median and ulnar nerve neuropathy.  (Id.) He advised Plaintiff to follow up with neurology.

Plaintiff also visited the hospital on two occasions, in October 2011 and March 2012, complaining of chest pain.  (R. at 404, 410.)  Besides these two occasions, the record contains no other information in which Plaintiff complained of chest pain.

On October 13, 2011, Plaintiff visited the emergency room because he experienced a pain on the left side of his chest when he took a sharp turn in the shower.  (R. at 410, 413-14.)  While at the hospital, however, Plaintiff reported that he did not experience any pain.  (R. at 411, 415.)  Testing at the hospital also revealed regular heart sounds and intact sensation, (R. at 415), in addition to high blood pressure.[1]  (R. at 412.) Plaintiff was discharged on the same day and instructed to take

---

[1] Plaintiff's blood pressure tested 151/88; a normal blood pressure is 120/80.  (R. at 412.)

Motrin and his usual medications, insulin, metformin, and neurontin.  (R. at 412.)

On March 17, 2012, Plaintiff was admitted to the hospital due to his complaint of chest pain, which was likely caused by cocaine use.  (R. at 405, 428.)  At the time the chest pain began, Plaintiff was drinking alcohol and smoking crack cocaine. (R. at 404.)  According to the hospital discharge summary, Plaintiff presented with "burning" pain in his chest that was radiating to his left arm.  (R. at 404.)  He failed to take his diabetes medication on the day prior to the onset of his chest pain, (R. at 405), and a urine drug screen was positive for cocaine and opiates.  (R. at 404.)  A stress test conducted was negative, and the chest pain was ultimately resolved with morphine.  (R. at 404-05.)  He had a transient episode of complete heart block and his symptoms were intermittent.  (R. at 404.)  The differential diagnosis included intrinsic conduction abnormality, autonomic neuropathy, toxic ingestion, and post-use cocaine crash.  (R. at 404.)  Plaintiff was discharged and instructed to take his insulin and metformin, in addition to aspirin, blood pressure and heartburn medication, and medication for his legs.  (R. at 405-06.)

Upon his discharge from the hospital on March 19, 2012, Plaintiff made a follow-up appointment with Dr. Baskerville on March 26, 2012, during which he made no complaints regarding his

9

arms.  (Id. at 432-24.)  Then, on June 19, 2012, Plaintiff
complained of numbness in the fingers of his right hand and
"some tingling" in his right arms.  (Id. at 420.)  Dr.
Baskerville's assessment includes notation of injury to the
median and ulnar nerves.  (Id.)

On June 27, 2012, Dr. Baskerville assessed Plaintiff's
residual functional capacity and compiled his findings in his
Medical Source Statement.  (R. at 398-402.)  Dr. Baskerville
found that, during an eight-hour workday, Plaintiff should sit
for a total of five to six hours; stand or walk for a total of
one hour; and rest for a total of one to two hours.  (R. 398-
402.)  In addition, he could occasionally lift a maximum of ten
pounds but could never balance or stoop.  (R. at 400, 402.)

Although Dr. Baskerville's treatment notes include only a
single instance of complaints of numbness in Plaintiff's right
arm, he also found that Plaintiff had a series of functional
limitations with regard to reaching, handling, and fingering.
(R. at 401.)  When reaching, Plaintiff could occasionally use
his left hand and arm but could never use his right hand or arm;
when handling, Plaintiff could occasionally use his left hand
but could never use his right hand; and when fingering,
Plaintiff could occasionally use his left hand but could never
use his right hand.  (R. at 401.)

In addition to these visits, Plaintiff sought psychiatric treatment at MedNet Health Systems from October 2011 until August 2012 for his major depression recurrent, with psychotic features.  (R. at 33-34, 79-80, 344-397.)  In his Comprehensive Biopsychosocial Evaluation, Plaintiff reported that his depression started in 2002 after the death of his mother.  (R. at 83, 378.)  He also reported having suicidal ideations and that he was hearing voices.  (R. at 376-80.)  As part of his treatment, Plaintiff was prescribed medication and underwent psychotherapy on a weekly basis with Dr. Victoria Conn.  (R. at 379.)  Over the course of his treatment Dr. Conn assessed Plaintiff's depression to be the result of his strained marital relationship, his inadequate social interaction, his anxiety over his medical illness, his financial difficulty, and his worrying and insomnia.  (R. at 345-90.)  According to the psychiatrist, Plaintiff appeared to be making progress in his treatment, including in his ability to sleep better, his compliance with his treatment recommendations for his diabetes, his decreased anxiety, his ability to make new friends and engage in healthy social activities, and, at times, his efforts to have a cordial relationship with his fiancée.  (R. at 345-390.)

11

D.   **Plaintiff's Testimony**

At the June 28, 2012 hearing, Plaintiff testified that he has held several jobs from 2001 to 2012, including deli worker, inventory control specialist, and cashier.  (R. at 42-48.)  He also loaded and unloaded trucks, stocked store shelves, did housekeeping, and worked in a kitchen.  (R. at 42-48.)  He further testified that he was fired from all of these positions because he had to call out due to his illnesses.  (R. at 42-48.)

Plaintiff claims that he can no longer work because he is always fatigued; has heaviness or no feeling in his legs from his knees on down, which prevents him from walking more than a block at a time; he has numbness in his fingers and right arm up to the elbow; he has difficulty using the bathroom and cleaning himself; his toenails are falling off; and he has sores that are slow to heal.  (R. at 48.)  In regards to his right arm and hand, Plaintiff testified he has trouble picking things up, but he can do it if he puts his mind to it, and it bothers him to lift his right arm above his head.  (Id. at 52.)  Plaintiff also stated he cannot use a keyboard with his right hand.  (R. at 52.)  Plaintiff testified that he uses his left hand to do most of the tasks he used to do with his right hand, but he has to learn to use his left hand more; he did not testify to any problems with his left hand.  (See, e.g., id. at 53-54.)  Plaintiff also testified that he takes medication for his

12

diabetes, insulin and Metformin, which has helped but his doctor believes his blood sugars are "still kind of high." (R. at 51.)

Plaintiff further testified that he has a history of substance abuse, including testifying about his hospital visit for drug-related symptoms. (R. at 49-50, 56.) He testified that the last time he used cocaine was about seven months prior to the hearing. (R. at 77.) He attributed his cocaine use to his depression, which was caused by his inability to work and provide for his family. (R. at 56-57.) He also testified that he used to drink alcohol but has stopped, and that he still smokes cigarettes but wants to stop this as well. (R. at 78.)

### E.   The ALJ's Decision

Applying the requisite five-step analysis, the ALJ concluded that Plaintiff met the insured status requirements of §§ 216(i) and 223[2] of the Social Security Act through September 30, 2013, and that Plaintiff had not engaged in substantial gainful activity ("SGA") since the original alleged onset date, March 31, 2009. (R. at 12.) At Step Two the ALJ found that Plaintiff suffers the following severe impairments: diabetes

---

[2] Section 223(d) of the Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

mellitus, neuropathy, depression NOS (not otherwise specified), and substance-induced mood disorder.  (R. at 12.)

At Step Three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 13.) Furthermore, based on his findings, the ALJ determined that Plaintiff has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), including climbing ramps/stairs, balancing, stooping, kneeling, and crouching.  (R. at 14.)  Plaintiff is not able to climb ladders, ropes, and scaffolds, and he must avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc.). (R. at 14.)

The ALJ also stated that Plaintiff's subjective complaints regarding the intensity, persistence, and limiting effects of his alleged symptoms are not credible.  (R. at 15.)  Considering all of the medical evidence of record, including from the treating physician, Dr. Baskerville, the state agency physician, Dr. Angelina Jacobs, and the state medical examiner, Dr. Yacov Kogan, as well as the claimant's testimony, in making his determination the ALJ found that "there is nothing in the record to indicate [Plaintiff] is unable to do work at the medium level of exertion with necessary, nonexertional limitation."  (R. at

14

15-16.)  In reaching this conclusion, the ALJ afforded little weight to the assessment of Plaintiff's treating physician, Dr. Baskerville, explaining that it was unsupported and inconsistent with the record.  (Id.)

After performing the RFC assessment, at step four of the analysis, the ALJ determined that Plaintiff was capable of performing his past relevant work as a dishwasher, which is medium and unskilled, as it does not require performance of activities precluded by Plaintiff's RFC.  (R. at 16); see also 20 C.F.R. §§ 404.1565, 416.965.  As such, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act, from March 31, 2009, through the date of this decision.  (R. at 16); see also 20 C.F.R. §§ 404.1520(f), 416.920(f).

## II.  **ANALYSIS**

Plaintiff makes several arguments on appeal concerning the ALJ's analysis of the record and corresponding findings.  In particular, Plaintiff argues that the ALJ erred in: (1) failing to impose any manipulative limitations as part of his RFC assessment; (2) finding that Plaintiff could return to his past relevant work as a dishwasher/kitchen helper in his step-four analysis; and (3) failing to discuss or evaluate multiple GAF scores of 45 when assessing Plaintiff's RFC.

15

A.    __Manipulative Limitations__

Plaintiff first argues that the ALJ erred by failing to include manipulative limitations in the RFC assessment.  (See R. 14-16.)  Specifically, Plaintiff contends that the ALJ erred in affording little weight to the opinion of Dr. Baskerville, his treating physician, and in finding Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms "not entirely credible."  (Id. at R. 15.)  As such, Plaintiff argues that the ALJ's findings are not based on substantial evidence.  (See Pl.'s Br. at 8-9.)  The Court disagrees.

First, the ALJ did not err by affording less weight to Dr. Baskerville's RFC assessment.  The ALJ is not required to accept a treating physician's opinion where the opinion is not supported by clinical evidence, is internally inconsistent, or is not consistent with other evidence in the record.  20 CFR §§ 404.1527(c)(2), 416.927(c)(2).  Even though a treating physician's opinion may generally carry greater weight than a non-examining consultant, if "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason."  See Coleman v. Comm'r of Soc. Sec. Admin., 494 Fed. App'x 252, 254 (3d Cir. 2012) (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.

16

2000)).  The ALJ is also permitted to rely upon state agency
medical consultant opinions to support the RFC assessment.  See
Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir. 2011)
(stating that a state agency physicians' opinions merit
"significant consideration").

Here, Dr. Baskerville's assessment determined that
Plaintiff was never capable of reaching, handling, and fingering
with his right hand and arm and only occasionally doing so with
his left hand and arm.  (Id. at 401.)  The ALJ considered this
opinion and afforded it little weight because it was unsupported
by clinical evidence.  Specifically, he noted that Dr.
Baskerville "had not been treating the claimant for long when he
filled out the form.  The assessment was basically a series of
check marks and circles on a form, and was not a narrative
providing reasoning for his limitations."  (R. at 16.)
Moreover, the ALJ found that Dr. Baskerville's RFC assessment
was discordant with the other medical evidence in the record and
Dr. Baskerville's own limited treatment provided to Plaintiff
for these symptoms.  (Id.)

Instead, the ALJ gave more weight to the RFC assessment of
the state agency medical consultant, Dr. Jacobs.  (R. at 15.)
Dr. Jacobs assessed Plaintiff's RFC more moderately and provided
for no manipulative limitations.  (R. at 96.)  The ALJ
determined that this opinion was more consistent with the

17

medical record than Dr. Baskerville's assessment.  In
particular, Dr. Jacobs' opinion was harmonious with the
evaluation by Dr. Kogan, which concluded that Plaintiff had full
strength in all extremities and normal fine finger movements.
(R. at 322.)  Moreover, the ALJ relied upon some evidence in the
record that Plaintiff's condition was improving as he became
more compliant with his treatment of his diabetes.  (R. at 433.)

It is the role of the ALJ as fact finder to evaluate
medical opinions in the record.  28 C.F.R. §§ 404.1527,
416.927(c)(e).  When dealing with competing medical opinions,
the ALJ is permitted to give greater weight to one medical
opinion over another—even that of a treating physician—provided
the ALJ clearly explains why he or she gave greater weight to
one opinion.  Brown v. Astrue, 649 F.3d 193, 196-97 (3d Cir.
2011) ("The law is clear . . . that the opinion of a treating
physician does not bind the ALJ on the issue of functional
capacity.").  The ALJ clearly explained that the opinion of the
state agency physician was more internally consistent with the
record, particularly given the relatively scant nature of Dr.
Baskerville's proposed RFC and his limited history with
Plaintiff.  As such, the ALJ did not improperly assign less
weight to Dr. Baskerville's assessed RFC.

Likewise, the ALJ did not err in discounting the
credibility of Plaintiff's complaints concerning the extent of

18

his symptoms.  The ALJ is permitted to find all or portions of Plaintiff's subjective complaints not credible, Burns v. Barnhart, 312 F.3d 113, 130 (3d Cir. 2002) (holding that ALJ may reject testimony concerning subjective complaints where not consistent with the medical evidence), but the ALJ is required to provide reasons for rejecting portions of Plaintiff's testimony which conflict with his findings.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 130 (3d Cir. 2000) (stating that an ALJ must consider all pertinent medical and nonmedical evidence and "explain [any] conciliations and rejections"); Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (explaining that the ALJ "must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence.").  It is insufficient for an ALJ to make a conclusory statement regarding a Plaintiff's credibility.  SSR 67-P.  The ALJ must provide instead "specific reasons for the finding on credibility, supported by the evidence in the case record." Id.

Here, the ALJ concluded that Plaintiff's complaints about the intensity, persistence and limiting effects of the symptoms of his alleged disability were not entirely credible because they were inconsistent with the medical record.  Plaintiff testified to numbness in his right hand resulting in an almost complete inability to use it.  (R. at 53-54.)  The extreme extent of Plaintiff's symptoms are not borne out by the record.

While Dr. Baskerville's treatment record establishes a singular complaint by Plaintiff of generalized numbness in his right arm and hand, (R. at 420), the ALJ found that this one-time complaint was inconsistent with descriptions of Plaintiff's symptoms elsewhere in the record, (R. at 449),[3] where Plaintiff has never been treated for numbness in his hand to this extent (nor even complained of it.)  (R. at 15, 338-39, 341-43.)

Decisions by the ALJ concerning credibility must be based upon substantial evidence, but "they are entitled to deference because of [the ALJ's] ability to assess the demeanor of witnesses at the hearing."  Williams v. Barnhart, 87 Fed. Appx. 240, 242 (3d Cir. 2004).  The ALJ, relying upon substantial evidence, found Plaintiff's complaints concerning his manipulative limitations to be inconsistent with the record and elaborated upon that credibility determination.  This is precisely what the ALJ is permitted to do.  Granting the ALJ's credibility determination the requisite deference, this Court finds no error with it.

The role of the District Court in reviewing an ALJ's denial of disability benefits is not to reweigh the evidence presented, but instead to determine whether the ALJ made a decision

---

[3] Indeed, in Plaintiff's initial visit, he told Dr. Baskerville that he "has a lawyer to help him get disability due to numbness in his legs and in the left arm."  (R. at 449 (emphasis added).)

supported by substantial evidence.  Here, confronted with
evidence in the form of Dr. Baskerville's assessment of
Plaintiff's RFC on one hand and the evaluation and opinion of
Drs. Kogan and Jacobs on the other, the ALJ assessed Plaintiff's
RFC giving greater weight to the latter, clearly explaining why
he did so.  Likewise, confronted with subjective complaints
concerning Plaintiff's ability to use his right hand which were
inconsistent with other evidence in the record, the ALJ made the
permissible finding that the complaints were not entirely
credible.  Ultimately, these findings, coupled with the opinion
of the state agency physician, led the ALJ to make the RFC
findings he made.  Those findings are based upon substantial
evidence.  As such, the ALJ committed no error in declining to
impose manipulative limitations.

> **B.   Past Relevant Work**

Plaintiff next argues that the ALJ erred in step four by
finding that he could return to his past relevant work as a
dishwasher/kitchen helper. In making this determination, the ALJ
utilized the services of a vocational expert ("VE"), who
testified that Plaintiff's past relevant work as a dishwasher
was unskilled in nature and medium in exertional level, which
falls with the ALJ's RFC assessment.  (R. at 57-58); see also 20
C.F.R. §§ 404.1560(b)(2), 416.960(b)(2)(explaining that a VE can
provide helpful evidence and may offer expert opinion testimony

in response to a hypothetical question about whether a person with a claimant's RFC can meet the demands of the claimants previous work); Burns v. Barnhart, 312 F.3d 11, 119 (3d Cir. 2002) (stating that at the fourth and fifth steps of the sequential evaluation process, the ALJ often seeks advisory testimony from a vocational expert).

The crux of Plaintiff's argument is that the ALJ did not take into account the manipulative limitations imposed by Dr. Baskerville's assessment of Plaintiff's RFC.  Indeed, Plaintiff acknowledges that the argument hinges upon the Court accepting Plaintiff's argument that the ALJ erred in failing to impose manipulative limitations.  (Pl.'s Br. at 10.)  However, because the ALJ found that the evidence here failed to credibly establish that Plaintiff had limitations in the use of his right hand, the ALJ had no need to consider manipulative limitations of this sort as a part of his finding that Plaintiff could return to work as a dishwasher.  Therefore, the ALJ's step-four finding was appropriately made and amply supported by substantial evidence.

### C.  **Multiple GAF Scores**

Plaintiff also challenges the ALJ's failure to evaluate his mental restrictions, in light of multiple Global Assessment Functioning ("GAF") scores of 45 assigned by his treating psychiatrist.  "A district court reviewing an ALJ's decision

22

'needs from the ALJ not only an expression of the evidence he considered which supports the result, but also some indication of the evidence that was rejected.'" Marti v. Comm'r of Soc. Sec., C.A. No. 2:14-2085 (KM), 2015 WL 4716122, at *4 (D.N.J. Aug. 6, 2015) (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)). "Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such explanation is not provided." Fargnoli, 247 F.3d at 42.

Regarding mental health evaluation, a GAF score of 45 indicates that in the opinion of the evaluator the patient has "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job.)" Gilroy v. Astrue, 351 Fed. App'x 714, 715 (3d Cir. 2009). Specifically, "[A] GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2), 416.927(c) and SSR 06-03 . . . ." AM-13066. A GAF score is a snapshot of a person's functioning and is most useful when paired with a description of the underlying reasoning behind the rating. Id. Accordingly, the failure to discuss a GAF score is not by itself cause for remand, but the failure to discuss the medical records in which the GAF score appears may be. McLaughlin v. Comm'r of

Soc. Sec., C.A. No. 13-06948 (FLW), 2014 WL 6886039, at *11
(D.N.J. Dec. 3, 2014) ("Although there are cases where failure
to discuss low GAF scores has been cause for a remand,
nonetheless, if an ALJ incorporates references to the opinion or
medical evidence where the GAF score was found, the failure to
explicitly reference the score will not detract from her
reasoning.") (citations omitted).

In a summary fashion, the ALJ dealt with the Plaintiff's
mental health medical history by noting that Plaintiff began
receiving mental health treatment at MedNet Healthcare Systems
in October 2011 for his diagnosed major depressive disorder with
psychotic features. (R. at 15.) The ALJ also noted that
Plaintiff no longer receives treatment at this facility. (Id.)
The ALJ did not discuss Plaintiff's three GAF scores of 45, and
engaged in only minimal analysis of over fifty pages of
documents detailing Plaintiff's mental health treatment at
MedNet outside of the GAF scores.[4] While the remaining mental

---

[4] Looking to the record, the Clinical Progress Notes of
Plaintiff's psychiatrist at MedNet Health Systems suggest that
Plaintiff was making progress in his treatment, including in his
ability to sleep better, his compliance with his treatment
recommendations for his diabetes, his decreased anxiety, his
ability to make new friends and engage in healthy social
activities, and, at times, his efforts to have a cordial
relationship with his fiancé. (R. at 345-390.) In addition,
Plaintiff testified that he no longer receives treatment in
accordance with the opinion of his psychiatrist that he can
handle his depression. (R. at 80.) He testified that his
depression comes and goes but that he no longer feels suicidal

health evidence suggests Plaintiff's functional limitations as a result of his mental health issues are slight and incorporated into the ALJ's RFC assessment, this Court finds that multiple GAF scores and corresponding mental health treatment represent a piece of relevant opinion evidence pertaining to that finding that should have been discussed and reconciled.

The cases relied upon by Defendant do not persuade the Court otherwise.  While the court in Gilroy found the ALJ's opinion was supported by substantial evidence despite its failure to address a one-time GAF score of 45, "it did make repeated references to observations from [the treating doctor's] reports."  351 Fed. Appx. 714, 716; see also Carpenter v. Comm'r of Soc. Sec., C.A. No. 10-5762, 2012 WL 194384, at *2 (D.N.J. Jan. 23, 2012) (finding ALJ opinion was based on substantial evidence despite no discussion of GAF scores when "the ALJ explicitly [addressed the doctor's] finding and his reasons for discounting them in light of later psychological evaluation.") Here, in contrast, the ALJ only summarily discussed the record of treatment Plaintiff received at MedNet, and he did not grapple with the implications of three consecutive GAF scores below 50.

---

or hears voices, and that his medication works well.  (R. at 26, 82-86.)  He also testified that he recently took a trip to California, which had a positive effect on his emotional state. (R. at 79, 85-86.)

In sum, the evidence in the record concerning Plaintiff's mental health does appear to support the ALJ's findings with regard to the functional limitations of Plaintiff's RFC. Nevertheless, three troublesome GAF scores of 45, which embody opinions about serious symptoms or impairments, or at the least the surrounding context of the treatment in which those scores were given warrant a discussion.  Accordingly, the Court is constrained to say Plaintiff's RFC finding, to the extent it dealt with his mental health symptoms, rested upon substantial evidence.  For this reason, the Court remands the matter to the ALJ for further explanation of his RFC findings consistent with this Opinion.[5]  An appropriate Order follows.


DATED: September 29, 2015

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

---

[5] In addition, the Court notes that only a few weeks prior to the ALJ's decision, Plaintiff (through his attorney) submitted a letter to the ALJ "amend[ing] his onset date . . . to December 1, 2011."  (R. at 212.)  Neither party discussed this letter. The Court does not address this issue, but it may have relevance on remand.